**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| WILLIAM HENRY SADBERRY, III | * | |
| | * | |
| v. | * | Case No. SAG-11-382 |
| | * | |
| COMMISSIONER, SOCIAL SECURITY | * | |
| | * | |

******

**MEMORANDUM OPINION**

William Henry Sadberry, III (sometimes referred to as "Claimant" or "Mr. Sadberry") brought this action pursuant to 42 U.S.C. § 405(g), seeking review of a final decision by the Commissioner of the Social Security Administration ("Commissioner"), denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. This matter is before me by the parties' consent. [ECF Nos. 3, 7]. Pending are the parties' cross-motions for summary judgment. [ECF Nos. 14, 18]. No hearing is necessary. Loc. R. 105.6. For the reasons set forth below, the plaintiff's motion for summary judgment is DENIED, the defendant's motion for summary judgment is GRANTED, the decision of the Commissioner is AFFIRMED, and the Clerk is directed to CLOSE this case.

**I. BACKGROUND**

Mr. Sadberry applied for DIB and SSI on January 24, 2008, alleging that he has been disabled since November 1, 2007. Tr. 100-108. Mr. Sadberry's claims were denied initially and upon reconsideration. Tr. 54-58, 62-63. Mr. Sadberry filed a timely request for a hearing and appeared, with representation, at a video hearing before the Honorable Melvin D. Benitz, Administrative Law Judge ("ALJ") on August 13, 2009. Tr. 20-49.

In a written decision dated September 17, 2009, the ALJ denied Mr. Sadberry's claims, concluding that he had not been under a disability within the meaning of the Social Security Act at any time from November 1, 2007 through the date of the decision. Tr. 10. The Appeals Council denied Mr. Sadberry's request for review on December 21, 2010, making the ALJ's decision the final, reviewable decision of the Commissioner. Tr. 1-4.

## II.     STANDARD OF REVIEW

The function of this Court is not to review Mr. Sadberry's claims *de novo* or to reweigh the evidence of record. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986). Rather, this Court is to determine whether, upon review of the whole record, the Commissioner's decision is supported by substantial evidence and a proper application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987); see 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla but less than a preponderance of the evidence presented. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1996). It is such relevant evidence as a reasonable mind might accept as adequate to support a verdict were the case before a jury. Johnson v. Califano, 434 F.Supp. 302, 307 (D.Md. 1977). Usually, if substantial evidence supports the Commissioner's decision, the decision must be upheld. Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972); see 42 U.S.C. § 405(g).

In addition to reviewing the ALJ's decision to determine whether it is supported by substantial evidence, this Court also must determine whether the ALJ properly applied the law. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman, 829 F.2d at 517. After reviewing the ALJ's decision,

this Court may affirm, modify, or reverse the decision of the ALJ and may remand the case for a rehearing. Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991); Coffman, 829 F.2d at 519; Vietek v. Finch, 438 F.2d 1157, 1158 (4th Cir. 1971); see 42 U.S.C. § 405(g).

In determining whether a claimant is disabled within the meaning of DIB, the Commissioner has promulgated regulations that set forth a five-step sequential evaluation procedure. See 20 C.F.R. § 404.1520. This five-step process, described by the Supreme Court in Bowen v. Yuckert, 482 U.S. 137 (1987), begins with the ALJ determining whether the claimant is engaged in substantial gainful activity, which is defined for DIB claims in 20 C.F.R. §§ 404.1510, 404.1572. If the claimant is engaged in a substantial gainful activity, the claimant is not considered disabled. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ next examines the physical and/or mental impairments alleged by the claimant and determines whether these impairments meet the durational and severity requirements set forth in 20 C.F.R. §§ 404.1509 and 404.1520(c).

If the impairment or impairments meet the durational and severity requirements, the ALJ's analysis proceeds to a third step—a consideration of whether the impairment or impairments, either severally or in combination, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is known as the Listing of Impairments ("Listings"). Bowen, 482 U.S. at 141; Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001). If one of the Listings is met, disability will automatically be found without consideration of age, education, or work experience. If no Listing is met, however, the ALJ moves to a fourth step and considers whether the claimant retains the residual functional capacity ("RFC") to perform past relevant work. Bowen, 482 U.S. at 141; Mastro, 270 F.3d at 177. An individual's RFC "is the most [the individual] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). If the ALJ

finds that a claimant retains the RFC to perform past relevant work, the claimant will be found not to be disabled. Bowen, 482 U.S. at 141.

If a determination is made that the claimant is not capable of performing his or her "past relevant work," the ALJ moves to a fifth step and considers whether, based upon the claimant's RFC, age, education, and past work experience, the claimant is capable of some other work. Id. at 142; Mastro, 270 F.3d at 177. At this step the burden shifts to the Commissioner. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995). If the claimant suffers solely from exertional impairments,[1] the Medical–Vocational guidelines, as defined in Part 404, Subpart P, Appendix 2 ("Guidelines"), provide rules to be applied in determining whether a claimant is disabled. An ALJ, in applying the Guidelines, will examine the claimant's age, education, work experience, and RFC to determine which rule applies. 20 C.F.R. § 404.1520(d). The rule will direct a conclusion as to whether a claimant is disabled. Id.

The Guidelines, however, will not be used when the claimant suffers from both exertional and non-exertional impairments. 20 C.F.R. § 404.1569a(d). In such a case, the ALJ is required to employ the use of a vocational expert to determine whether the claimant is still capable of some work. 20 C.F.R. § 404.1560. If the claimant is not capable, disability will be found.

**III. ALJ'S DECISION**

---

[1] Impairments may be exertional or non-exertional. An exertional limitation is one that affects the claimant's ability to meet the strength demands of certain jobs. 20 C.F.R. § 416.969a(b). A non-exertional impairment is a "limitation that is present whether the claimant is attempting to perform the physical requirements of the job or not." Gory v. Schweiker, 712 F.2d 929, 930 (4th Cir. 1983). "[W]here the claimant's impairment is nonexertional-not manifested by a loss of strength or other physical ability—or is marked by a combination of exertional and non-exertional impairments, the grids' Rules are not conclusive, and full individualized consideration must be given to all relevant facts of the case." Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983).

After reviewing all of the evidence, including the medical records and Mr. Sadberry's testimony, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 30, 2012.

2. The claimant has not engaged in substantial gainful activity since November 1, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: cardiomyopathy with chronic heart failure, diabetes mellitus, and hypertension (20 CFR 404.1520(c) and 416.920(c)).
. . .

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
. . .

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is limited to lifting/carrying 20 pounds occasionally and 10 pounds frequently and sitting/standing thirty minutes constantly on an alternate basis. The claimant is unable to perform activities requiring prolonged balancing, climbing, stooping, and must avoid ladders, ropes, and stair climbing due to fatigue. He must have a bathroom readily available and must avoid hazards and heights. He is able to drive and is limited to simple, routine jobs with low concentration and stress.
. . .

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on May 30, 1979 and was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).
. . .

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See

    SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)).

. . .

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2007 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 12-18.

### IV.  SUMMARY OF EVIDENCE

At the time of his administrative hearing, Mr. Sadberry was thirty years old, six feet, four and one-half inches tall, and weighed approximately 315 pounds. Tr. 25,34. Mr. Sadberry has a ninth-grade education and can read and write in English. Tr. 33. He alleged disability due to sleep apnea, congestive heart failure ("CHF"), diabetes mellitus, short term memory loss, enlarged liver, high blood pressure, blood clots, and migraines. Tr. 134. At his hearing, Mr. Sadberry also alleged that obesity, frequent episodes of dizziness, and carpal tunnel syndrome contributed to his disability.

On January 2, 2008, Mr. Sadberry underwent a transthoracic echocardiogram. Tr. 481. Dr. Christian Bounds, a cardiologist, interpreted the report and found that Mr. Sadberry had an enlarged left ventricle without hypertrophy, severe global hypokinesis without discrete regional wall motion abnormalities, and a left ventricle ejection fraction estimated to be 20%. Id.

On January 3, 2008, Mr. Sadberry underwent a right and left heart catheterization, which revealed severe nonischemic dilated cardiomyopathy with an ejection fraction of about 10%, probable insignificant mitral regurgitation, and severe pulmonary hypertension with evidence of bi-ventricular failure. Tr. 483-484. The reporting physician recommended aggressive intravenous diuresis and consideration for defibrillator and/or transplant therapy. Id.

On January 9, 2008, Dr. Bounds completed a form evaluating Mr. Sadberry for the medical assistance program. Tr. 446-49. Although Dr. Bounds opined that Mr. Sadberry's medical condition would prevent him from working, he also opined that he had no restrictions in sitting, could lift or carry 25 pounds frequently, and could use his hands for repetitive action. Tr. 447.

On February 18, 2008, Dr. Gregory N. Thompson opined that Mr. Sadberry's obstructive sleep apnea was under good control with CPAP therapy. Tr. 452-53.

On March 5, 2008, Mr. Sadberry underwent an exercise tolerance test, and exercised for six minutes and ten seconds. Tr. 480. The test showed fair exercise tolerance, normal heart rate and blood pressure response, no arrhythmias, and no angina. Id. Dr. Bounds indicated that Mr. Sadberry could proceed with cardiac rehabilitation. Id.

Less than two weeks later, on March 17, 2008, Mr. Sadberry underwent a nuclear medicine MUGA scan, which showed left ventricular dilation and some right ventricular dilation, global left ventricular hypokinesia, and an ejection fraction of about 25%. Tr. 475.

On March 25, 2008, Dr. Bounds noted that Mr. Sadberry was on an adequate heart failure regimen and his weight was improving. Tr. 464. Because his ejection fraction was not improving, Dr. Bounds referred Mr. Sadberry to his colleague, Dr. Stephen G. Keim to consider treatment options.

On March 31, 2008, Dr. Keim opined that Mr. Sadberry had responded very well to treatment and encouraged him to continue with his weight loss. He did not prescribe treatment at that time for improving ejection fraction, preferring to see if it would recover with weight loss. Tr. 463.

On June 19, 2008, Mr. Sadberry underwent an echocardiographic evaluation. Tr. 489.

The 2D/M-Mode measurements from the procedure reflected a left ventricular ejection fraction M Mode of 39%. Id. Dr. Joseph Raffetto's summary of the procedure noted left ventricular enlargement, normal left ventricular wall thickness, and diffusely abnormal left ventricular wall motion with a moderately diminished ejection fraction. Id.

Between June 23, 2008 and October 17, 2008, Mr. Sadberry engaged in Phase II cardiovascular/pulmonary rehabilitation. Tr. 546. The discharge summary prepared by the cardiac rehabilitation facility noted a diagnosis of CHF, hypertension, diabetes, obesity, and anxiety, and reported that Mr. Sadberry had completed the pre-set goals of his cardiac/pulmonary rehabilitation. Id. Specifically, the report noted that Mr. Sadberry had lost an additional 28 pounds, was undertaking a variety of changes to reduce his risk factors (including decreasing the amount of his smoking) and, although unemployed, had returned to all previous activities of daily living. Tr. 547. In addition, the report indicated that Mr. Sadberry was considering enrollment in a phase III maintenance program in Salisbury, MD. Id.

On July 16, 2008, Dr. Bounds noted that Mr. Sadberry was feeling better as he lost weight. Tr. 501. Dr. Bounds stated that Mr. Sadberry's congestive heart failure was improving with his weight loss. Id. He placed him "somewhere between Class II and III symptoms chronically."[2] Id.

On August 11, 2008, Mr. Sadberry was evaluated by Dr. Keim at a follow-up visit, in anticipation of pending ophthalmologic surgery by Dr. Lewis. Tr. 500. Dr. Keim's report indicated that Mr. Sadberry's last ejection fraction was 26%, but that Mr. Sadberry had lost 100 pounds since that time, and was responding well to medications. Id.

---

[2] The "classes" relate to functional capacities as classified by the New York Heart Association. Higher classification indicates more limitation of functional capacity. For example, Class III is more severe than Class II.

On August 19, 2008, Mr. Sadberry underwent a stress echocardiogram. Tr. 503. At the time, Mr. Sadberry weighed 297.6 pounds and his resting blood pressure was 112/60. Id. The report indicated a normal myocardial response to exercise, improved global left ventricular systolic function, and a resting left ventricular ejection fraction in the normal range (greater than 50%), which represented "an excellent response to medical therapy." Id.

On October 16, 2008, prior to discharge from cardiac rehabilitation, Mr. Sadberry underwent another exercise tolerance test. Tr. 548. He was able to exercise for 9 minutes at Bruce protocol, doubling his exercise time from the stress test conducted when he entered the cardiac rehabilitation program. Id. In a note accompanying the stress test report, Dr. Elizabeth T. Guy remarked that Mr. Sadberry's results were excellent in light of his significant cardiomyopathy at the beginning of the year. Tr. 549. She also acknowledged Mr. Sadberry's significant weight loss, his use of the C-PAP machine in conjunction with his sleep apnea, his cardiac rehab program, and the results of the stress test done by Dr. Keim in August, 2008, which showed an ejection fraction of greater than 50%. Id. Dr. Guy noted that Mr. Sadberry complained of dizzy spells "when he is up and around at his home," that Dr. Bounds had reduced some of Mr. Sadberry's blood pressure medication, and that if the dizziness continues, Mr. Sadberry could wear a Holter monitor, although she did not order one at the time. Id.

On September 16, 2008, Mr. Sadberry underwent eye surgery at Johns Hopkins Hospital, to correct a large angle exotropia in his left eye. Tr. 505.

On November 5, 2008, non-examining physician Dr. J. Biddison completed a physical RFC assessment for Mr. Sadberry, for purposes of reconsideration of the denial of benefits. Tr. 511-518. Dr. Biddison noted a primary diagnosis of cardiomyopathy, a secondary diagnosis of hypertension, and other alleged impairments of diabetes, sleep apnea, and obesity. Tr. 511. Dr.

Biddison considered the test results from Mr. Sadberry's August, 2008 echocardiogram, specifically noting the left ventricular ejection fraction of .50 as "markedly improved from 0.26 in 2007." Id. In addition, Dr. Biddison expressly considered the reports from physical examinations of Mr. Sadberry done by Dr. Josephine Ibironke, at Johns Hopkins Hospital in June, 2008, in connection with Mr. Sadberry's left eye exotropia, and by Dr. Keim in August, 2008. Id. Dr. Biddison reported that Mr. Sadberry could occasionally lift 20 pounds and could lift 10 pounds frequently, as well as stand and/or walk for six hours in an eight-hour work day. Tr. 512. In addition, Dr. Biddison determined that Mr. Sadberry could sit for six hours in an eight-hour work day, and could push and/or pull without limitations other than the lifting restrictions. Id. Dr. Biddison also determined that Mr. Sadberry could frequently balance, stoop, kneel, crouch, and crawl; occasionally climb ramps and stairs; and never climb ladders, ropes or scaffolds. Id. Dr. Biddison noted Mr. Sadberry's marked improvement in LV function and significant weight loss. Tr. 516.

On January 16, 2009, Dr. Bounds examined Mr. Sadberry and noted that he was doing very well. Tr. 543. Mr. Sadberry's weight was down to 284, and Dr. Bounds' report indicated that Mr. Sadberry's morbid obesity was "markedly improved with 120-pound weight loss in the last 12 months." Id. Dr. Bounds also noted that Mr. Sadberry "is on a good medical regimen," although he still had Class II symptoms. Id.

On May 15, 2009, Dr. Bounds examined Mr. Sadberry at a follow-up visit, and reported Mr. Sadberry as having CHF with nonischemic cardiomyopathy with chronic New York Heart Association Class II symptoms, esotropia (sic), morbid obesity (which had markedly improved after a 120-pound weight loss over the previous 12 months), stable asthma, remote DVT history, and a history of hypertension. Tr. 541. Dr. Bounds noted that Mr. Sadberry was "actually doing

very well," and decreased several of Mr. Sadberry's medications because of an instance of Mr. Sadberry getting "a little hypotensive" at cardiac rehabilitation.  Id.

On June 15, 2009, Dr. Bounds completed an American Heart Association form for Mr. Sadberry, assessing Mr. Sadberry's functional capacity as Class III and his therapeutic classification as Class C. Tr. 519.  In his accompanying memo, Dr. Bounds indicated that Mr. Sadberry's limitations have been present since he began treating Mr. Sadberry on January 2, 2008, for decompensated heart failure, cardiomyopathy, and an ejection fraction between 20 and 30%. Tr. 520.  The accompanying memo also appears to indicate that Mr. Sadberry is "Class II – chronic." Id.

On June 19, 2009, Mr. Sadberry underwent an exercise tolerance test at Delmarva Heart, LLC.  Tr. 540.  Mr. Sadberry exercised for 9 minutes.  Id.  The report showed good exercise tolerance, normal heart rate and blood pressure response, no arrhythmias or angina, and the reporting physician cleared Mr. Sadberry for cardiac rehabilitation.  Id.

On July 8, 2009, a "Physical Residual Functional Capacity Assessment" was filed by G. Albright, M.D., who reviewed the file and did not examine Mr. Sadberry.  Tr. 491-499.  Dr. Albright found that Mr. Sadberry could lift ten pounds occasionally and less than ten pounds frequently, stand and/or walk for two hours in an eight-hour workday, sit for six hours in an eight-hour workday, and push and/or pull without limitations other than his lifting restrictions. Tr. 492. Mr. Sadberry could occasionally climb ramps and stairs, stoop, kneel, crouch, or crawl, but could "never" balance or climb a ladder, rope or scaffold. Tr. 493.  Dr. Albright found that other than avoiding exposure to hazards such as machinery and heights, the only environmental limitation on Mr. Sadberry was to avoid concentrated exposure to extreme heat or cold.  Tr. 495. In the assessment, Dr. Albright noted that just after his hospitalization for CHF, Mr. Sadberry

was "able to prepare simple meals and do some light household chores, as well as drive a car and shop for groceries," that Mr. Sadberry "has clinically improved since that time," and that "[t]hese statements would be considered credible." Tr. 496.

At the hearing held on August 13, 2009, Mr. Sadberry testified that he suffered from dizziness and shortness of breath, but could lift his 17-pound son, although Mr. Sadberry cannot carry the child for a long period of time. Tr. 26-27. He testified that he gets dizzy "at least six times a day," and that such dizziness could occur while sitting down, when getting up, or when walking. Tr. 27. He testified that he could "be just sitting on the couch, and get dizzy," Tr. 28, that the dizziness started in "January, 2008 when he began all the medication, and that he asked his doctor about it, and it's because of the medications that [he] takes." Tr. 37.

## V. ANALYSIS

Mr. Sadberry raises two arguments in support of his claim. First, he contends that he meets or equals listing 4.02 (Chronic Heart Failure), and that in erroneously finding that he did not meet that listing, the ALJ inappropriately rejected the opinion of his treating physician, Dr. Bounds. Second, he contends that the ALJ failed to evaluate his obesity in combination with his other impairments. This Court disagrees with both contentions.

Mr. Sadberry contends that he meets medical listing 4.02 because he has shown (1) medically documented presence of systolic failure . . . with ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure) and (2) persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom a [medical consultant] has concluded that the performance of an exercise test would present a significant risk to the individual. Mr. Sadberry fails to meet the first criteria.

Mr. Sadberry has five total readings of ejection fraction in his medical evidence. During Mr. Sadberry's hospitalization for decompensated heart failure in January, 2008, he had two readings of 20 percent and 10 percent. Tr. 313, 325. On March 17, 2008, he had a reading of 25 percent. Tr. 475. As his weight loss improved, on June 29, 2008, he had a reading of 39 percent. Tr. 489. On August 19, 2008, he had a reading in normal limits (above 50 percent).[3] Tr. 503. The evidence therefore does not document an ejection fraction under 30 during a period of stability. Mr. Sadberry's low ejection fraction readings only occurred during his hospitalization for heart failure and during one appointment during a period of stability in March, 2008. The condition therefore did not meet the duration requirement of twelve months.

Mr. Sadberry further contends that, in evaluating the listing, the ALJ improperly rejected Dr. Bounds's June 15, 2009 opinion indicating that he suffered from Class III symptoms and marked limitations.[4] Mr. Sadberry posits that because Dr. Bounds is a treating source, his opinion cannot be dismissed without a detailed explanation. However, the ALJ's explanation for rejecting Dr. Bounds's June 15, 2009 opinion was sufficient in detail and based on substantial medical evidence. First, the apparent designation of Mr. Sadberry as "Class III" and "marked limitations" was inconsistent with Dr. Bounds's own treatment notes from several prior examinations, including one just one month before. Second, an exercise tolerance test just four days after Dr. Bounds's opinion showed good exercise tolerance, which would contradict a

---

[3] Mr. Sadberry suggests that his ejection fraction fluctuated, based upon an alleged August 11, 2008 reading of 26 percent. Pl. Mot. at 8. Mr. Sadberry appears to be misreading Dr. Keim's report of August 11, 2008, where he notes, "His last ejection fraction was 26%. He has lost 100 lb. since that time . . . " Tr. 500. In fact, there seems to be steady improvement of his ejection fraction corresponding to his weight loss.

[4] As noted above, there appears to be an internal inconsistency within Dr. Bounds's June 15, 2009 opinion, because on the second page, Dr. Bounds appears to classify Mr. Sadberry as only "Class II- Chronic." Tr. 520.

suggestion that Mr. Sadberry suffered from marked limitation of physical activity.  That medical evidence provides sufficient support for the ALJ's decision to discount Dr. Bounds's opinion.

Finally, Mr. Sadberry contends that the ALJ failed to properly consider his obesity in combination with his other impairments.  The ALJ specifically considered his obesity as follows:

> It is noted that although the claimant is obese, 6'4½" tall and weighs 315 pounds (testimony), there is no evidence that the claimant's obesity has resulted in systemic manifestations affecting other body systems or that his obesity has affected his ability to sustain activity on a regular and continuing basis during an eight-hour day, five-day week, or equivalent schedule.

Tr. 13.  Although it can be readily ascertained from the medical evidence that Mr. Sadberry's obesity contributed to or caused many of his medical impairments, some of which were severe, no evidence suggests that independent effects of his obesity created additional impediments to employment.  In other words, even though obesity apparently caused or worsened Mr. Sadberry's cardiomyopathy with chronic heart failure, diabetes, and hypertension, those illnesses produced certain functional limitations.  The ALJ appropriately concluded that obesity itself did not add any additional functional limitations to those presented by the illnesses.

## VI. CONCLUSION

For the reasons set forth above, Mr. Sadberry's motion for summary judgment is DENIED, the defendant's motion for summary judgment is GRANTED, the decision of the Commissioner is AFFIRMED, and the Clerk is directed to CLOSE this case.

A separate order shall issue.

Dated:  May 10, 2012                               /s/
                                                    Stephanie A. Gallagher
                                                    United States Magistrate Judge